UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

DONNIE RAY FARLEY,                          )
                                            )
            Plaintiff,                      )
                                            )    Case No.: 2:10-0111
v.                                          )    JUDGE WISEMAN
                                            )    MAGISTRATE JUDGE BROWN
MICHAEL J. ASTRUE,                          )
Commissioner of Social Security,            )
            Defendant.                      )

To: The Honorable Thomas Wiseman, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security

Income (SSI) and Disability Insurance Benefits (DIB), as provided under Title XVI and Title II

of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate

Judge is Plaintiff's Motion for Judgment on the Administrative Record and Defendant's

Response. (Docket Entries 8, 10). The Magistrate Judge has also reviewed the administrative

record (hereinafter "Tr."). (Docket Entry 6). For the reasons set forth below, the Magistrate Judge

**RECOMMENDS** the Plaintiff's Motion be **GRANTED in part** and this action be

**REMANDED** to the Commissioner for a rehearing pursuant to 42 U.S.C. § 405(g), sentence

four.

## I. INTRODUCTION

Plaintiff first filed for SSI and DIB on February 24, 2008 with an alleged onset date of

January 1, 2006. (Tr. 27). His claims were denied initially on July 21, 2008 and upon

reconsideration on October 8, 2008. *Id*. At Plaintiff's request, a hearing was held before

Administrative Law Judge ("ALJ") James A. Sparks on February 16, 2010 in Cookeville,

Tennessee. (Tr. 9). On April 2, 2010, the ALJ rendered an unfavorable decision. (Tr. 27-38).

In his decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.

2. The claimant has engaged in substantial gainful activity since January 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).[1]

3. The claimant has the following severe impairments: diabetes mellitus; hypertension; and degenerative disc disease (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant [can] only occasionally climb ramps, stairs, ladders, ropes, or scaffolds; balance; stoop; kneel; crouch; or crawl.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 17, 1959 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

---

[1]Despite this finding, the ALJ proceeded to deny Plaintiff's claim at step five, rather than step one, of the sequential evaluation process outlined in part III-B.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 29-38). Plaintiff requested review by the Appeals Council on April 30, 2010. (Tr. 6). The Appeals Council denied review on October 14, 2010. (Tr. 1-3). Plaintiff filed this timely complaint on November 17, 2010. (Docket Entry 1).

## II. REVIEW OF THE RECORD

Plaintiff was born on June 17, 1959. (Tr. 9). He is married and lives with his wife, Connie Farley. (Tr. 100). Plaintiff is six-foot-one and weighs 215 pounds. (Tr. 9-10). He has a seventh grade education. (Tr. 10). Plaintiff has worked as a mechanic since 1975 and has been self-employed since 1993 as the sole owner of Farley Auto in Monterey, Tennessee. (Tr. 103-04, 109). Plaintiff claims disability because he suffers from diabetes, high blood pressure, high cholesterol, anxiety, and back, arm and leg pain. (Tr. 49).

Plaintiff first visited Dr. Gray Smith, his primary care physician, on May 5, 1993, presenting with low back pain. (Tr. 449). Dr. Smith noted some paraspinous muscle spasms and diagnosed Plaintiff with a lumbar strain and possible disc disease, prescribing Naprosyn, Flexeril and Vicodin. *Id.* On May 12, 1993, Dr. Smith noted that Plaintiff's lumbar strain was improving

and advised him to start walking but refrain from heavy lifting. *Id.* On May 19, 1993, Dr. Smith noted that Plaintiff's low back strain was resolved and that he had no impairment. *Id.*

A June 10, 1996 MRI of Plaintiff's lumbar spine showed disc herniation at L4-5 and apparent extruded disc fragment posterior to the L4 vertebral body. (Tr. 465). A June 17, 1996 exam and MRI with Dr. Steven Abrams revealed an L4-5 disc rupture, and Dr. Abrams recommended surgery – a lumbar laminotomy. (Tr. 254). Surgery was successfully performed on June 18, 1996. (Tr. 251). In his follow-up with Dr. Abrams on July 15, 1996, Plaintiff noted only occasional aches without back or predominant leg pain. (Tr. 250). On August 12, 1996, Plaintiff was deemed fit to return to light duties at work. (Tr. 249). By October 8, 1996, Plaintiff reported that he was working four days per week and "tolerating that well," after which Dr. Abrams released him from further follow-up. (Tr. 247).

On August 22, 2001, Plaintiff reported to Dr. Smith again, complaining of tingling in the left arm. (Tr. 448). Dr. Smith prescribed Relafen, Flexeril and Vicodin and scheduled an MRI on the lumbar spine for the following day. That MRI, performed by Dr. Daniel Coonce, revealed "mild degenerative changes" in the discs of the cervical spine with disc space narrowing. (Tr. 463). A neurosurgical consultation on August 30, 2001 with Dr. Abrams revealed a "demonstrable size difference" in the left and right biceps, implying atrophy, but full range of motion of the cervical and lumbar spine. (Tr. 238). A CAT scan performed on September 11, 2001 revealed lumbar spondylosis, cervical spondylosis, and a question of disc protrusion, prompting Dr. Abrams to consider surgery at a later date. (Tr. 224).

After a September 25 consultation, Plaintiff underwent surgery – a cervical laminotomy – on October 5, 2001, which was performed without complications. (Tr. 220-21). At physical

therapy on October 30, 2001, Dr. Vaughan Allen noted that Plaintiff's strength was within normal limits but that cervical range of motion was reduced. (Tr. 218). On January 29, 2002, Plaintiff complained of persistent numbness and pain, but he noted that the pain was diminished relative to pre-surgery levels. (Tr. 215). Plaintiff was inclined to continue his home workout program, and Dr. Abrams prescribed Mobic, Skelaxin, and Zanaflex for pain. *Id.* On April 2, 2002, Plaintiff failed to show for an appointment and was discharged from Dr. Abrams' care. (Tr. 213).

Plaintiff made six visits to Dr. Smith between January 17, 2002 and July 23, 2003. (Tr. 446-48). On January 17, Plaintiff reported blurry vision and high blood pressure, which Dr. Smith opined could be symptoms of diabetes mellitus ("DM"). (Tr. 448). On January 31, Dr. Smith diagnosed Plaintiff with DM. *Id.* On March 14, Plaintiff reported that his alcohol intake was down and that his back pain was causing him trouble sleeping. (Tr. 447). Plaintiff did not return to Dr. Smith until May 16, 2003, when he reported further trouble with neck and arm pain. *Id.* On June 19, Plaintiff reported drinking seven beers per day and some chest pains; Dr. Smith noted that the DM was "out of control" and that Plaintiff was a "time-bomb [who] is not serious about getting his alcoholism under control." (Tr. 446). A Thallium Stress Test performed on June 25 was negative. (Tr. 458). On July 23, Dr. Smith reported that Plaintiff was in better control of his DM and that the negative stress test meant that his chest pains were not evidence of heart disease. (Tr. 446). On all six visits, Dr. Smith increased or refilled Plaintiff's Lotrel prescription for his blood pressure. (Tr. 446-48).

Plaintiff reported to the Cookeville Regional Medical Center ("Cookeville Regional") on September 13, 2004, complaining of rib, sacrum, coccyx, and lumbar spine pain due to a fall.

(Tr. 383-85). The center found disc space narrowing in the lumbar spine including early spondylosis at L5, "offsets" in the sacrum and coccyx requiring clinical correlation, and no displaced rib fracture. (Tr. 384). Plaintiff reported "a lot of pain" in a follow-up exam three days later, but no surgery was recommended. (Tr. 362).

Plaintiff was referred to the Perdue Wellness Center ("Perdue"), where on June 8, 2006 he reported that he had cut back his drinking to "3-6 per day" and had been drinking since age ten. (Tr. 264). He complained of back pain and insomnia and attributed the drinking to those problems, as well as one pack per day of cigarettes. *Id.* On August 6, 2007, he returned to Perdue, requesting pain medication because he was about to take a vacation. (Tr. 263).

On that same day, Plaintiff was treated at Cookeville Regional for an allergic reaction and difficulty swallowing. (Tr. 499). Doctors observed swelling in his forehead and a skin rash. *Id.* On September 10, 2007, he reported an allergic reaction to medication for which he was rushed to the ER at Cookeville Regional the night before. (Tr. 261). On October 22, 2007, Plaintiff reported difficulty with urticaria over the last five or six years, which breaks out anytime he is exposed to brake dust fluid or cleaner at work. (Tr. 341). He also had an allergic reaction to aspirin three weeks prior to that appointment. *Id.* An epi-pen two pack was prescribed to alleviate allergic reactions. (Tr. 342).

Dr. Donita Keown of Tennessee Disability Determination Services examined Plaintiff on June 27, 2008. (Tr. 277-78). Dr. Keown noted that, generally, Plaintiff is "ambulatory at a normal pace" without an assistive device. (Tr. 277). He demonstrated a normal straightaway walk, tandem walk, toe lift, heel walk and one-foot stand. *Id.* He had a 90 degree dorsiflexion

range of the lumbar spine and a 25 degree extension, as well as left/right lateral flexion of 25 degrees. *Id.*

Dr. Marvin Cohn completed a physical Residual Function Capacity ("RFC") Assessment of Plaintiff on July 16, 2008. (Tr. 293-300). Dr. Cohn concluded that Plaintiff can lift fifty pounds occasionally and twenty-five pounds frequently. (Tr. 294). Plaintiff can stand and/or walk six hours and sit six hours in an eight-hour workday. *Id.* Plaintiff's pushing and pulling are unlimited. *Id.* Dr. Cohn based these conclusions on the lack of evidence of reduced mobility, range of motion, or strength as documented in Plaintiff's records from Perdue. (Tr. 294-95). Dr. Cohn also concluded that Plaintiff can climb, balance, stoop, kneel, crouch, or crawl occasionally but has no manipulative, visual, hearing/speaking, or environmental limitations. (Tr. 295-97).

Dr. Jeffrey Wright completed a psychiatric review of Plaintiff on July 21, 2008 based on an assessment from January 1, 2006 through July 17, 2008. (Tr. 279-92). Dr. Wright concluded that Plaintiff has anxiety-related disorders – specifically Anxiety NOS – but that the impairments were not severe enough to warrant a disability determination. (Tr. 279). Dr. Wright also noted that Plaintiff has no functional limitations that would restrict his daily living, social functioning, or ability to maintain concentration, persistence, or pace. (Tr. 289).

Plaintiff underwent an MRI of the lumbar spine at Cumberland Neurosurgery on July 25, 2008. (Tr. 311). That exam revealed a mild posterior central disc bulge, degenerative disc changes, and left facet hypertrophy. *Id.* A physical examination performed at Perdue on August 12, 2008 revealed normal range of motion, muscle strength, and tone, and no tenderness to palpation, though surgery was strongly recommended on the spine. (Tr. 338-40). That

examination also noted that, at Plaintiff's age, "it is highly unlikely that he will be able to return to work" following the surgery. (Tr. 338). Dr. Joseph Jestus of Cumberland Neurosurgery recommended surgery following an evaluation on September 30, 2008, but Plaintiff declined at that time. (Tr. 424).

Dr. Christopher Fletcher performed another RFC Assessment on October 1, 2008. (Tr. 353-60). Dr. Fletcher concluded that Plaintiff could lift twenty pounds occasionally and ten pounds frequently. (Tr. 354). Plaintiff can stand and/or walk two hours and sit six hours in an eight-hour workday. *Id.* Plaintiff's push and pull capacity are unlimited. *Id.* Dr. Fletcher, however, does not note the basis for these conclusions, merely writing "Stand/Walk 4 Hrs" in the explanation section of the form assessment. *Id.* Dr. Fletcher also concluded that Plaintiff can balance and kneel frequently; stoop, crouch, crawl, and climb ramps and stairs occasionally; and never climb ladders, ropes, or scaffolds. (Tr. 355). Dr. Fletcher noted limited reaching capabilities but no other manipulative limitations. (Tr. 356). No visual or communicative limitations were observed, but Dr. Fletcher noted that Plaintiff should avoid concentrated exposure to extreme cold or heat and fumes, dusts, gases, and poor ventilation; Plaintiff should also avoid all exposure to "hazards" such as machinery and heights. (Tr. 356-57). Again, Dr. Fletcher provides little support for these conclusions, merely noting "Chronic Opiate Use." (Tr. 357). On the last page of his evaluation, Dr. Fletcher cites medical records from the Perdue Wellness Center, Dr. Keown, and three additional appointments in 2008, without having examined Plaintiff himself. (Tr. 360).

On October 2, 2008, Plaintiff reported to Cumberland Back Pain Clinic complaining of neck pain and low back pain, self-rating his pain level as a seven out of ten, its effect on his

activity level as a five of ten, and its effect on his sleep as an eight of ten. (Tr. 402-08). He was started on a program of medication, trigger point injections, and other interventional injections. *Id.* An electrodiagnostic report on October 14, 2008 reveals "very severe" impairments in the left (C6) radial nerve lateral branch, right (C7) radial nerve medial branch, and bilateral (C6) unlar [sic] nerve. (Tr. 409). Plaintiff also reported that day that he was feeling no help from his October 2 shots. (Tr. 398). Treatment on October 28, 2008 was deferred due to Plaintiff's decision to pursue surgery. (Tr. 395). On November 24, 2008, Plaintiff reported that his pain was an eight of ten. (Tr. 393).

Dr. Jestus examined Plaintiff on December 12, 2008 and diagnosed spinal stenosis in the cervical region and myelopathy, scheduling Plaintiff for surgery to "prevent further neurologic decline." (Tr. 426-28). Plaintiff underwent a cervical decompressive laminectomy on December 19, 2008 and "tolerated the procedure well." (Tr. 429). Plaintiff was discharged on December 22, 2008 with a prescription for Percocet and instructions on wound care and physical limitations. (Tr. 433). Plaintiff reported on December 30, 2008 that the surgery "may be helping him" and that he may be regaining some of his strength. (Tr. 431). On January 21, 2009, Plaintiff reported some mild neck pain, but Dr. Jestus noted that his preoperative myelopathy symptoms were "much better." (Tr. 435). On February 24, 2009, Dr. Jestus noted that Plaintiff's range of motion, strength, and gait were normal, but Plaintiff still reported neck and arm pain that prevented him from going to work the previous week. (Tr. 439-41).

Plaintiff returned to Dr. Jestus for follow-up each month beginning on April 3, 2009 and ending on September 8, 2009. (Tr. 467-86). At each visit, Dr. Jestus proclaimed that Plaintiff's range of motion, strength, and gait were normal and that he was able to stand without difficulty.

*Id.* He was prescribed Percocet and Soma for the pain. *Id.* On August 27, 2009, Dr. Randy Gaw concluded that Plaintiff's neuropathy symptoms were consistent with mild left carpal tunnel syndrome ("CTS"). (Tr. 443-44). An MRI performed on August 28, 2009 revealed mild disc space narrowing and a mild central disc bulge at C4-5. (Tr. 470). Noting these conditions, however, Dr. Jestus declined to recommend further surgery and discharged Plaintiff to Dr. Smith on September 8, 2009. (Tr. 468).

Plaintiff visited the Crossville Medical Group on January 8, 2010 seeking a new primary care physician. (Tr. 532). An examination completed by Dr. William Harelson noted that Plaintiff's surgical incisions were healed but that he had a limited cervical range of motion. (Tr. 533). His diabetes and hypercholesterolemia were noted to be stable. *Id.* On follow-up on January 12, 2010, Plaintiff was diagnosed with chronic cervical degenerative disc disease ("DDD"), cervical spondylosis, and lumbar disc degeneration. (Tr. 537).

Dr. Michael Cox examined Plaintiff upon his request and performed an RFC Assessment on January 31, 2010. (Tr. 526-31). Dr. Cox concluded that Plaintiff can lift ten pounds occasionally and less than ten pounds frequently. (Tr. 526). Plaintiff can stand and/or walk two hours and can sit less than six hours in an eight-hour workday. *Id.* Pushing and/or pulling are limited in both upper and lower extremities, and Plaintiff would be required to periodically alternate sitting and standing to relieve pain or discomfort. (Tr. 527). To support these conclusions, Dr. Cox cited Plaintiff's cervical and lumbar DDD. *Id.* Plaintiff's pain would be frequently severe enough to interfere with attention and concentration, and he would need to take a break every thirty minutes in an eight-hour workday. *Id.* Plaintiff's impairments will sometimes produce "bad days" such that he would need to be absent from work about three

times per month. *Id.* Plaintiff has postural limitations as well: he can only occasionally climb, balance, kneel, and crouch but can never crawl due to his DDD. (Tr. 528). Plaintiff has no manipulative, visual/communicative, or environmental limitations. (Tr. 528-29). In addition to DDD, Dr. Cox also cited Plaintiff's Type II DM and essential hypertension as the causes of his impairments. (Tr. 531). In his examination notes, Dr. Cox noted that Plaintiff's range of motion in his joint was normal with the exception of a minor impairment in the lumbar spine. *Id.* He also noted that Plaintiff's right hand grip strength was normal, and his left hand grip strength was a four out of five. *Id.*

Plaintiff testified in front of ALJ James A. Sparks at his hearing on February 16, 2010. (Tr. 9-19). He testified that he has pain in the entire left side of his body and takes OxyContin and Percocet, which relieve most of the pain. (Tr. 10). With medication, his pain is about a five out of ten on an average day; without medication, the pain is an eight out of ten. (Tr. 18). He testified that he has difficulty holding his mechanic's tools, that he drops them when he starts turning them. (Tr. 15). He has left leg pain from his back problems which is "tolerable," pain across the lower back that makes him feel stiff, and "pretty bad" neck pain when not taking medication. (Tr. 18).

Plaintiff testified that he can walk one-quarter of a mile at a time, can stand for thirty minutes, can sit twenty to thirty minutes in a chair, can pick up a gallon of milk, and cannot bend, stoop or squat. (Tr. 10-11). While he is capable of fixing himself a sandwich, his wife does most of the cooking. (Tr. 12). He watches TV and can follow the storyline "most of the time." (Tr. 11). He has problems remembering things, problems concentrating, and problems sleeping; he sleeps "three, four hours a night." *Id.* Plaintiff testified that he rarely lies down during the day

but then admitted to stretching out on the recliner for "20, 30 minutes" about four to five times per day. (Tr. 17). When he lies on the recliner, he keeps a pillow between his legs to ease his back pain. *Id.* Plaintiff testified that he can pick up a gallon of milk with his left hand but might drop a plate of food if carrying it with only the left hand. (Tr. 18-19). Plaintiff can drive and even drove to the ALJ hearing. (Tr. 10).

Plaintiff testified that he felt "pretty good" after his first surgery on his back, in 1996, but that his lower back problems have not changed much since then. (Tr. 13). After his surgery on his leg in 2000, he began having trouble using his left arm. (Tr. 14). Plaintiff testified that his arm has hurt ever since that surgery and that he has tremors in that arm and trouble holding it still. *Id.* After the third surgery, on his arm in 2008, Plaintiff testified that there was some improvement but that he still can't pick up anything with the left arm. *Id.* Plaintiff can pick up things with his right arm, but that causes strain in his neck area. *Id.*

Plaintiff testified that he has worked and gotten paid "a little" since the onset of his disability on January 1, 2006. (Tr. 10). Plaintiff testified that he earned about $6,000 in 2006 for his work as a mechanic and made about $800 in 2008. (Tr. 15). Plaintiff's earnings record reflects that he made $5,838 in 2006, nothing in 2007, and $814 in 2008. (Tr. 104).

Vocational Expert Jane Hall also testified at Plaintiff's ALJ hearing. (Tr. 19-22). Hall described Plaintiff's previous work as skilled and medium to heavy.[2] With the physical limitations as set by Dr. Cohn in his RFC assessment,[3] Hall was then asked whether a

---

[2]While the Dictionary of Occupational Titles classifies mechanic work as skilled and medium, Hall testified that Plaintiff's work on semi-tractor trucks is sometimes heavy as it's performed today.

[3]Tr. 293-300; the ALJ transcript misprints the doctor's name as "Cone."

hypothetical 46-year-old[4] with Farley's education and RFC could perform prior work or any other relevant work. (Tr. 20). Hall testified that such a person could not return to Plaintiff's prior work, but he could perform other jobs in the economy, including but not limited to janitor or cleaner (18,000 such jobs in Tennessee, 1,000,000 nationwide), assembler (30,000 in Tennessee, 639,000 nationwide), or laborer (16,000 in Tennessee, 567,000 nationwide). *Id.* These jobs are all at a medium RFC. *Id.*

If Plaintiff's testimony were given full credibility, however, Hall testified that he would not be able to perform any jobs in the economy. (Tr. 21). A forty-hour work week, she claimed, would not be possible if he has significant trouble bending, stooping and squatting and if he has to lie down in the recliner four times per day. *Id.* Furthermore, assuming the restrictions set forth by Dr. Cox,[5] Plaintiff would not be able to perform any prior work or other work. (Tr. 21-22).

Plaintiff's wife, Connie Farley, filed a Third Party Function Report on August 24, 2008. (Tr. 162-74). Mrs. Farley noted that Plaintiff occasionally works three to four hours per day. (Tr. 162). Plaintiff gets "about 3 to 5 hours" of sleep per night but gets up throughout the night. (Tr. 163). Plaintiff does not perform household chores but may mow the lawn once every week or two, which lasts three to four hours. (Tr. 164). Plaintiff is capable of going to the store to buy soda and cigarettes, and he goes fishing "every 3 or 4 weeks." (Tr. 165-66). Mrs. Farley also noted that Plaintiff can only walk fifty to one hundred feet before having to stop and rest. (Tr. 166). Plaintiff's brother-in-law, Billy Ray Walker, also filed a Third Party Function Report on

---

[4]Farley's age at his onset date of January 1, 2006.

[5]Tr. 526-31.

September 6, 2008, noting that Plaintiff occasionally tries to go to work for a couple of hours during the day if he is able. (Tr. 194-201).

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff cites three errors allegedly committed by the ALJ. First, the ALJ errred in rejecting Plaintiff's subjective complaints of pain. Second, the ALJ failed to give proper consideration to the opinion of Dr. Michael Cox. Third, the ALJ failed to properly consider Plaintiff's age at the time of the decision. The Magistrate Judge believes that this action should be remanded based on the third alleged error, but this Report and Recommendation first discusses the merits of the first two errors for the record.

A.      Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Sec'y*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Sec'y*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Comm'r*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389

(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Sec'y*, 753 F.2d 517, 519 (6th Cir. 1985).

B.      Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.      If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.      If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.      If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[6] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4.      If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5.      Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

---

[6] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C.    <u>The ALJ Properly Weighed the Medical Opinions of Dr. Cox, Dr. Fletcher, and Dr. Cohn</u>

Plaintiff argues that the ALJ improperly discredited the opinions of Dr. Cox and Dr. Fletcher, both of whom opined that he was less than capable of performing work-related activities. (Pl.'s Br. 14). Specifically, Plaintiff argues that the ALJ gave too much weight to the opinion of Dr. Cohn, a state agency physician who did not examine him and made his assessment prior to Plaintiff's third surgery and other medical findings. (Pl.'s Br. 15). Furthermore, Plaintiff takes issue with the ALJ's assertion that Dr. Cox's opinion is not based on "medically acceptable clinical findings and laboratory diagnostic techniques." (Pl.'s Br. 17). Plaintiff asserts that the opinion of Dr. Cox, a physician who examined him, should receive more weight than that of Dr. Cohn, who did not. (Pl.'s Br. 15).

Opinions of treating physicians are generally entitled to great weight, greater than contrary opinions of a consulting physician who has examined the claimant on only a single occasion. *See Rogers v. Comm'r*, 486 F.3d 234, 242 (6th Cir. 2007). However, the opinion of a treating physician who examined the claimant only once is not entitled to the extra weight given to the opinion of treating physicians. *Atterberry v. Sec'y of Health and Human Servs.*, 871 F.2d 567, 572 (6th Cir. 1989); *See also Smith v. Comm'r*, 482 F.3d 873, 876 (6th Cir. 2007) (holding that two physicians who had each seen the claimant on just one occasion for treatment purposes were

not "treating physicians"). Such an opinion will be weighed as that of any other consulting physician. *Id.*

If there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994). While the ALJ is not bound by the opinions of any treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

The administrative record shows only one visit from Plaintiff to Dr. Michael Cox, and as such, his opinion is not entitled to as much weight as that of a "treating physician." *Atterberry*, 871 F.2d at 572. However, even if Dr. Cox's opinion is given extra weight, the ALJ gave sufficient evidence to reject his opinion. Dr. Cox concluded that Plaintiff can lift ten pounds occasionally, less than ten pounds frequently, and is limited when it comes to standing, sitting, pushing, pulling, and working a continuous eight-hour day. (Tr. 526-27). However, in his examination notes, Dr. Cox noted that Plaintiff's range of motion in his joints was normal with the exception of a minor lumbar spine impairment. (Tr. 531). He also noted that Plaintiff's right hand grip strength was normal and that his left hand grip strength was a four out of five. *Id.* The

ALJ concluded that Dr. Cox's RFC Assessment was not supported by medically acceptable clinical findings and laboratory diagnostic techniques; in other words, his RFC opinion did not match the observations that he noted in his examination. (Tr. 35). To the extent that the ALJ should have considered the opinion of Dr. Cox, he correctly rejected it to the extent that Dr. Cox's conclusions were inconsistent with his medical observations.

The ALJ points out that the opinion of Dr. Cohn is more consistent with objective medical evidence of record than the opinions of Dr. Cox and Dr. Fletcher. (Tr. 35-36). Plaintiff argues that Dr. Cohn's opinion is based on incomplete evidence in the medical record, such as Plaintiff's cervical decompressive laminectomy and mild CTS. (Pl.'s Br. 15). However, the ALJ considered the record as a whole when evaluating the validity of Dr. Cohn's opinion and determined that it was consistent with the medical evidence of record. (Tr. 36). While Plaintiff had three surgeries from 1996 through 2008, his follow-up sessions consistently revealed improvement and reduced pain. With respect to Plaintiff's December 2008 laminectomy, Dr. Jestus consistently proclaimed that Plaintiff's range of motion had returned to normal and discharged him after nine months. The ALJ also points out that Plaintiff's daily activities, such as fishing, mowing the lawn, and occasionally working at his mechanic's garage, demonstrate an ability to perform work-related activity beyond the disabling level opined by Dr. Cox and Dr. Fletcher. (Tr. 36). The Magistrate Judge believes that the ALJ gave proper weight to the opinion of Dr. Cohn because it was supported by substantial evidence in the medical record.

To the extent the Plaintiff wanted the ALJ to consider the opinion of Dr. Fletcher, the Magistrate Judge believes that the ALJ properly discredited this opinion for the same reasons as he rejected the opinion of Dr. Cox. Dr. Fletcher, unlike Dr. Cox, did not even examine Plaintiff

and made his recommendation based solely on a review of the medical record. The records that Dr. Fletcher cites do not support his conclusion of a severely disabling impairment, as he cites the opinions of the Perdue Wellness Center and Dr. Keown that show normal mobility, range of motion, and lumbar flexion. (Tr. 360).

D.      The ALJ Properly Evaluated Plaintiff's Subjective Complaints of Pain

Plaintiff argues that the ALJ erred in rejecting Mr. Farley's subjective complaints of pain. (Pl.'s Br. 13). It is unclear what specific complaints the Plaintiff alleges the ALJ to have overlooked or improperly rejected, but it appears as if the Plaintiff would have liked the ALJ to give more weight to Plaintiff's testimony at the hearing and the third party reports of Mrs. Farley and Billy Ray Walker. To the extent that the ALJ was required to consider these opinions, the Magistrate Judge believes that he had substantial evidence to disregard them.

Evaluating a plaintiff's subjective complaints of pain involves a credibility determination on the part of the ALJ. An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Further, discounting the credibility of a claimant is appropriate where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id*. Like any other factual finding, however, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003).

The ALJ concluded that Plaintiff's subjective complaints of disabling pain were inconsistent with other medical evidence, and the overall evidence did not establish excess pain or

greater work-related limitations. (Tr. 33). Plaintiff underwent a lumbar laminectomy in June 1996; however, he reported feeling much better post-operatively and reported back to work within two months. (Tr. 247-54). Plaintiff underwent a cervical laminectomy in October 2001; he reported reduced pain and successfully completed a home workout program to the point where he stopped following up with Dr. Abrams. (Tr. 213-21). Dr. Jestus reported that Plaintiff's symptoms were generally better following his second cervical laminectomy in December 2008 and declined further surgery in September 2009. (Tr. 435-41, 468). The Magistrate Judge believes that the ALJ properly determined that the medical records did not show a disabling impairment in light of Plaintiff's improvements following all three surgeries.

With respect to the third party reports filed by Mrs. Farley and Billy Ray Walker, the ALJ actually uses that evidence against the Plaintiff, as the reports document day-to-day home and work activities inconsistent with a disabling impairment. (Tr. 35). Perceptible weight must be given to the testimony of lay witnesses where it is consistent with medical evidence. *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1054 (6th Cir. 1983). It is unclear what third party evidence Plaintiff would have liked the ALJ to consider, since much of the evidence from those reports weighs against his claims of disability. The Magistrate Judge believes that the ALJ properly considered the reports from Mrs. Farley and Mr. Walker to the extent that they are consistent with medical records suggesting an ability to perform work-related activities.

E.      The ALJ's Misrepresentation of Plaintiff's Age Was Significant Legal Error

Plaintiff was born on June 17, 1959 and alleges onset disability on January 1, 2006, when he would have been 46 years old. Plaintiff's ALJ hearing occurred on February 16, 2010, and the ALJ rendered his decision on April 2, 2010, when Plaintiff would have been 50 years old. A

claimant's age is generally determined by his age on the date of the ALJ decision. *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). The Medical-Vocational Guidelines define a person aged 18-49 as a "younger individual" and one aged 50-54 as "closely approaching advanced age." 20 CFR § 404.1563(c)-(d). The ALJ committed significant legal error in representing Plaintiff as a 46-year-old rather than a 50-year-old in his questions to the Vocational Expert regarding Plaintiff's ability to adjust to other work.

A claimant's age is a vocational factor that should be considered in determining whether the claimant can adjust to other work in the economy. 20 CFR § 404.1563. Ability to adjust to other work is not determined on the basis of age alone; a finding of disability considers a claimant's chronological age in combination with RFC, education, and work experience. § 404.1563(a). For younger persons (under age 50), age generally does not seriously affect ability to adjust to other work. § 404.1563(c). For persons closely approaching advanced age (age 50-54), age may seriously affect ability to adjust to other work when combined with severe impairments and/or limited work experience. § 404.1563(d).

In his decision, the ALJ classified Plaintiff as a "younger" individual aged 18-49. (Tr. 37). In his questions to the VE regarding Plaintiff's ability to adjust to other work, the ALJ asked her to "assume a hypothetical 46-year-old as of onset." (Tr. 20). The Commissioner claims that "both the ALJ and the VE were aware of Plaintiff's age when they considered Plaintiff's ability to adjust to other work." (Def.'s Br. 23). The Commissioner also claims that the VE "noted that Plaintiff was 50 years old during the hearing." (Def.'s Br. 22). However, nothing in the transcript suggests that the VE actually considered Plaintiff to be 50 years old, which would place him in the "closely approaching advanced age" category, when making her determination. Since the

VE's determination as to whether Plaintiff could adjust to other work might change according to the stipulations in § 404.1563(d), this age misrepresentation is significant legal error.

The Commissioner also contends that Plaintiff's legal remedy, if placed in the correct age category, would be a placement into GRID Rule 203.19, as opposed to Rule 203.26, which would also direct a finding of "not disabled." (Def.'s Br. 21). However, the ALJ did not apply the GRID mechanically. The ALJ noted that Plaintiff does not have the RFC to perform all medium work; rather, his "ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations." (Tr. 37). In doing so, the ALJ adjusted down from GRID Rule 203.26, which governs individuals of "younger" age. The Magistrate Judge believes that this decision must be remanded to adjust down from Rule 203.19, which governs individuals "closely approaching advanced age," to determine whether Plaintiff can adjust to other levels of medium work.

## IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **GRANTED in part** and this action be **REMANDED** to the Commissioner for a rehearing pursuant to 42 U.S.C. § 405(g), sentence four.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this

Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).



        ENTERED this 12th  day of July, 2011.


                                <u>/S/ Joe B. Brown</u>
                                JOE B. BROWN
                                United States Magistrate Judge